

FILED
AUG 02 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                           DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> GLOBAL GOLD EXCHANGE, LLC; <br> RICHARD M. OWEN; <br> JEFFREY MORROW; <br><br> Defendants. | Case No. 19cr2936-CAB <br><br> **I N F O R M A T I O N** <br><br> Title 18, U.S.C., Sec. 1956(a)(1)(B)(i) – Money Laundering; Title 18, U.S.C., Sec. 1960 – Operating Unlicensed Money Transmitting Business; Title 18, U.S.C., Sec. 1341 – Mail Fraud; Title 18, U.S.C., Sec. 922(g) – Possession of a Firearm or Ammunition by a Prohibited Person; Title 18, U.S.C., Secs. 982(a)(1) and 924(d)(1), Title 28, U.S.C., Sec. 2461(c) – Criminal Forfeiture |

The United States Attorney charges:

## INTRODUCTORY ALLEGATIONS

At all times material to this Information:

1. Defendant GLOBAL GOLD EXCHANGE, LLC was a California limited liability company, and began operating in the Southern District of California no later than February 7, 2013. Its managing member was defendant JEFFREY MORROW, and

defendant RICHARD M. OWEN was also a member (collectively, the "Co-Defendants").

2. The Co-Defendants were residents of the Southern District of California. Defendant RICHARD M. OWEN was convicted of Wire Fraud, in violation of Title 18, United States Code, Section 1343, in or about 2004.

## GLOBAL GOLD EXCHANGE, LLC's Bank Secrecy Act Obligations

3. Defendant GLOBAL GOLD EXCHANGE, LLC described itself on company filings with the State of California as a "precious metals dealer." As such, GLOBAL GOLD EXCHANGE, LLC needed to develop and implement an Anti-Money Laundering ("AML") program, as required by Title 31, Code of Federal Regulations, 1027.210(a)(1) *et seq.* Accordingly on or about February 8, 2013, GLOBAL GOLD EXCHANGE, LLC appointed defendant RICHARD M. OWEN as its compliance officer, thereby making him responsible for developing and implementing GLOBAL GOLD EXCHANGE, LLC's AML program, and to monitor it to ensure compliance with the Bank Secrecy Act (Title 31, United States Code, *et seq.*), and the regulations thereunder (the "BSA").

4. Among the many AML duties, reports, and training imposed on GLOBAL GOLD EXCHANGE, LLC by the BSA, GLOBAL GOLD EXCHANGE, LLC was required to investigate, monitor, and, if suspicious, report transactions to the Financial Crimes Enforcement Network ("FinCEN"). FinCEN is a United States government agency within the U.S. Department of the Treasury tasked with safeguarding the financial system from illicit use, combatting money laundering, and promoting national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.

## Operation as an Unlicensed Money Transmitting Business

5. Within the Southern District of California and elsewhere, GLOBAL GOLD EXCHANGE, LLC, the Co-Defendants, and others operated as an informal money transfer system engaged in facilitating the transfer of money domestically and internationally outside of the conventional financial institutions system, and did so without regard for the source, destination, purpose, or legality of the funds transmitted. In short, the Co-

2

Defendants and others operated and managed GLOBAL GOLD EXCHANGE, LLC as an unlicensed money transmitting business ("MTB").

6. Beginning no later than August 8, 2017, and continuing through at least March 1, 2018, the Co-Defendants and others operated and managed GLOBAL GOLD EXCHANGE, LLC as a business, for profit, transmitting funds and exchanging currency for members of the public from cash into electronic funds, gold, and other valuable assets. Defendant did not register as an MTB with FinCEN, as required by the BSA and the regulations thereunder – specifically Title 31, United States Code, Section 5330.

7. Among the various money transmitting services that the Co-Defendants and GLOBAL GOLD EXCHANGE, LLC provided the public, it offered to, and in fact did through the conduct of the Co-Defendants, accept cash and return the funds in a different form, at a different location, or through a specific transaction or transmission, all at the direction of the customer.

## Unlicensed MTB Services

8. On or about June 28, 2017, Co-Defendant RICHARD M. OWEN, while inside GLOBAL GOLD EXCHANGE, LLC's office within the Southern District of California, told an undercover law enforcement agent (the "UCA") that GLOBAL GOLD EXCHANGE, LLC had recently had the "opportunity to work with the area local cartel out of Mexico," after receiving a request to convert millions of dollars' worth of gold into electronic funds. OWEN described how he was willing to personally "come down [to Mexico]. I'll arrange it to be picked up and brought across" to ensure that "nobody's going to question" the source, nature, purpose, or destination of the funds.

9. As an additional example, on or about August 8, 2017, Co-Defendant RICHARD M. OWEN, while inside GLOBAL GOLD EXCHANGE, LLC's office within the Southern District of California, told the UCA that one particular "client" sent GLOBAL GOLD EXCHANGE, LLC money in exchange for a future return of the funds, all masked as a gold transaction. Thus, when GLOBAL GOLD EXCHANGE, LLC sent the client a large wire transfer, GLOBAL GOLD EXCHANGE, LLC could claim, according to OWEN,

3

"it looks like a legitimate account ... [The wire transfer] legitimizes and looks like a complete gold transaction." In offering the same service to the UCA, OWEN concluded: "That's the thing – all we're here to do is to help facilitate whatever we can facilitate."

10. During his August 8, 2017 meeting with the UCA, Co-Defendant RICHARD M. OWEN entered a secured area of GLOBAL GOLD EXCHANGE, LLC's office and showed the UCA two rifles. While holding one, OWEN stated that he often took "one of my friends" – i.e., the guns – when transporting gold, cash, or other funds; elaborating: "That's going with me."

<u>GLOBAL GOLD EXCHANGE, LLC and the Co-Defendants Transmit $500,000</u>

11. The UCA accepted Co-Defendant RICHARD M. OWEN's offer to "facilitate" and "legitimize" as much money as GLOBAL GOLD EXCHANGE, LLC was able to handle. Between August 8, 2017 and October 26, 2017, the UCA delivered a total of $500,000 in cash to GLOBAL GOLD EXCHANGE, LLC, in the following increments (the "Transactions"):

    a. $50,000 cash, received on or about August 8, 2017;

    b. $100,000 cash, received on or about September 15, 2017;

    c. $150,000 cash, received on or about September 29, 2017; and

    d. $200,000 cash, received on or about October 18, 2017.

12. All of the Transactions were conducted with the following knowledge by each of the Co-Defendants, while at GLOBAL GOLD EXCHANGE, LLC's office, and while acting within the course and scope of their employment and agency and in part to benefit GLOBAL GOLD EXCHANGE, LLC:

    a. The UCA told Co-Defendant RICHARD M. OWEN, during the June 28, 2017 meeting, that the UCA "had some clients" who "were selling dope." It was immediately after this disclosure by the UCA that OWEN described GLOBAL GOLD EXCHANGE, LLC's recent opportunity to "work with the area local cartel out of Mexico."

    b. The UCA also told Co-Defendant RICHARD M. OWEN during the

4

August 8, 2017 meeting, that the UCA's "clients" "had moved up to cocaine".

c. The UCA told another manager of GLOBAL GOLD EXCHANGE, LLC ("Manager 1") that the UCA's clients were in the "weed business" and also "sell cocaine. They don't live here." In response to the UCA's statement that s/he was "cautious" because s/he had only previously spoken to, and transacted with, Co-Defendant RICHARD M. OWEN, Manager 1 responded: "Sure. But we're all like the same person basically." As discussed in more detail below, Manager 1 further stated that GLOBAL GOLD EXCHANGE, LLC would provide the UCA with false documentation for the Transactions, "because you know we invoice everything as, as gold transactions".

d. During a September 29, 2017 meeting with the UCA, the Co-Defendants discussed the significance, benefits, and tax implications for using fictitious gold invoices to conceal the true nature of the Transactions. When the UCA asked how to respond in the event law enforcement inquired about any of GLOBAL GOLD EXCHANGE, LLC's invoices, OWEN responded: "you just tell them, 'This is the receipt that they gave me. Go ask them [the Co-Defendants].' And then they'll just come to me. And then you call [me] – 'Hey, what do you got?' And boom, I'm done. [I'd tell them]: 'I'm a gold company. I buy and sell gold every day. These guys brought me gold. I sold it for them.'"

e. For each of the Transactions, one of the Co-Defendants or Manager 1 emailed, or hand-delivered, an invoice for the sale of "Scrap Gold" (the "False Invoices"). The amount of each False Invoice was equal to the amount of cash that the UCA had delivered to GLOBAL GOLD EXCHANGE, LLC's office, less a transaction "fee" of approximately 10%.

f. For each of the Transactions, one of the Co-Defendants or Manager 1 caused a transfer of funds from GLOBAL GOLD EXCHANGE, LLC's bank account (the "Global Gold Account"), to a bank account that the UCA provided. Each of these transfers from the Global Gold Account were in the

5

exact amount listed on the respective False Invoice, for the relevant Transaction.

g.  To conclude the deception, GLOBAL GOLD EXCHANGE, LLC maintained copies of the Invoices in a business file at its office under the name of the UCA, as if GLOBAL GOLD EXCHANGE, LLC actually purchased "scrap gold" from the UCA.

## Mail Fraud

13.  Between September and October 2017, the Co-Defendants devised a material scheme to defraud the United States out of money and property. In particular, during a September 29, 2017 meeting at GLOBAL GOLD EXCHANGE, LLC's office, the Co-Defendants told the UCA how they could further conceal the true nature of the Transactions from authorities. OWEN and MORROW directed the UCA to send a package in the mail that contained a heavy substance. By sending a heavy package that weighed approximately as much as a large amount of precious metal, OWEN and MORROW explained how they could defraud the government about the true nature of the Transactions. Thus, by sending a package in the mail to GLOBAL GOLD EXCHANGE, LLC's address, GLOBAL GOLD EXCHANGE, LLC, its employees, including the Co-Defendants and Manager 1, and the UCA would have another piece of evidence to claim that the UCA was merely sending gold in the mail to GLOBAL GOLD EXCHANGE, LLC, and GLOBAL GOLD EXCHANGE, LLC was wire transferring funds back to the UCA in exchange for the sale of gold. Or, as OWEN succinctly put it on September 29, 2017:

> ... and that takes care of the whole freaking problem because we send gold out of here.... As long as you're putting something that's got a little bit of weight into it, you're sending it to me, and I'm getting it. That way it looks like they're shipping it [the gold].

14.  During the September 29, 2017 meeting, Co-Defendant JEFFREY MORROW counted the cash the UCA had delivered to him inside GLOBAL GOLD EXCHANGE, LLC's office using a money-counting machine. While counting the cash, the UCA asked MORROW: "So should I address this box of rocks to you or Richard [OWEN]?"

MORROW answered: "Either/or. It really don't matter."

15.  In furtherance of the material scheme to defraud, on or about October 5 and October 26, 2017, GLOBAL GOLD EXCHANGE, LLC, the Co-Defendants, and Manager 1 caused two priority mail express parcels with tracking numbers EL783065774US and EL821929455US, purporting to contain gold, to be delivered to GLOBAL GOLD EXCHANGE, LLC in the Southern District of California. Inside each package was nothing more than a ream of paper. At a meeting on October 18, 2017 at GLOBAL GOLD EXCHANGE, LLC's office, the UCA asked Co-Defendant RICHARD M. OWEN how the first parcel worked. OWEN responded: "Perfect. It works perfect."

## COUNT 1

[Money Laundering – 18 U.S.C. § 1956]

16.  The introductory allegations set forth in Paragraphs 1 through 15 are realleged and incorporated by reference as if fully set forth herein.

17.  On or about October 18, 2017, defendants GLOBAL GOLD EXCHANGE, LLC, RICHARD M. OWEN, and JEFFREY MORROW conducted a financial transaction knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, namely the operation of an unlicensed money transmitting business, which constitutes a felony under federal law under Title 18, United States Code, Section 1960, and that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of proceeds from the operation of an unlicensed money transmitting business, all in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## COUNT 2

[Operating an Unlicensed Money Transmitting Business – 18 U.S.C. § 1960]

18.  The introductory allegations set forth in Paragraphs 1 through 15 are realleged and incorporated by reference as if fully set forth herein.

19.  Beginning no later than August 8, 2017, and continuing through at least March 1, 2018, defendants GLOBAL GOLD EXCHANGE, LLC, RICHARD M. OWEN,

7

JEFFREY MORROW, and others knowingly conducted, controlled, managed, supervised, directed, or owned all or part of a money transmitting business, which affected interstate or foreign commerce, and failed to comply with the money transmitting registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder, all in violation of Title 18, United States Code, Section 1960.

## COUNT 3

[Mail Fraud – 18 U.S.C. § 1341]

20. The introductory allegations set forth in Paragraphs 1 through 15 are realleged and incorporated by reference as if fully set forth herein.

21. On or about October 26, 2017, defendant GLOBAL GOLD EXCHANGE, LLC, acting with the intent to defraud, deceive, and cheat, knowingly devised and intended to devise a scheme or plan to defraud that had a natural tendency to influence, or was capable of influencing, a person to part with money or property through the use of the mails to carry out or attempt to carry out an essential part of the scheme or plan, all in violation of Title 18, United States Code, Section 1341.

## COUNT 4

[Possession of a Firearm or Ammunition by a Prohibited Person – 18 U.S.C. § 922(g)]

22. The introductory allegations set forth in Paragraphs 1 through 15 are realleged and incorporated by reference as if fully set forth herein.

23. Defendant RICHARD M. OWEN knowingly received firearms and ammunition that had been transported from one state to another, including:

Firearms

a. AR 15 variant .223 caliber rifle manufactured from an unfinished lower receiver bearing no manufacture markings or serial numbers with a large optic scope;

b. AR 15 variant .223 caliber pistol manufactured from an unfinished lower receiver bearing no manufacture markings or serial numbers;

c. AR 15 variant .223 caliber pistol manufactured from an unfinished lower receiver bearing no manufacture markings or serial numbers;

8

  d. Mossberg, Model 500 12 gauge pump action shotgun bearing serial number U448918;

  e. Hatson Arms Co., Model Escort semi-automatic shotgun bearing serial number 336551;

Ammunition

  a. Single round of Winchester 12 gauge ammunition;

  b. Approximately four hundred and twenty rounds of Wolf 7.62 x 39 ammunition;

  c. Approximately fourteen rounds of 14 gauge ammunition; and

  d. Approximately six hundred and sixty rounds of assorted ammunition (520 - 7.62x39; 15 - 12 gauge; 25 - 9mm, 100 - .40).

24. At the time defendant RICHARD M. OWEN received the Mossberg, Model 500 12 gauge pump action shotgun bearing serial number U448918, the Hatson Arms Co., Model Escort semi-automatic shotgun bearing serial number 336551, and the ammunition, defendant RICHARD M. OWEN had been convicted of a crime punishable by imprisonment for a term exceeding one year, to wit Wire Fraud, in violation of Title 18, United States Code, Section 1343, in or about 2004, all in violation of Title 18, United States Code, Section 922(g).

## FORFEITURE ALLEGATIONS

25. The allegations set forth in the Introductory Allegations and Counts 1 through 4 are realleged herein for purposes of seeking forfeiture to the United States of America pursuant to Title 18, United States Code, Sections 982(a)(1) and 924(d)(1), and Title 28, United States Code, Section 2461(c).

26. Upon conviction of the offenses alleged in Counts 1 and 2 of this Information, defendants GLOBAL GOLD EXCHANGE, LLC, RICHARD M. OWEN, and JEFFREY MORROW shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), any property, real or personal, involved in such offenses, or any property traceable to such property, including but not limited to:

  a. $600,000 in U.S. currency;

9

b. 1 oz. fine gold bar – The Perth Mint-Australia #B053876;

c. Silver US 1 troy oz. coins – 39 total;

d. Bag containing gold nuggets, weighing approximately 2-3 oz.;

e. Plastic container of gold nuggets, weighing approximately 200 oz.;

f. Unmarked standard gold bar, weighing approximately 400 oz.;

g. 1 kg Suisse fine gold – #C519737;

h. 1 kg Royal Canadian Mint fine gold – 5 total: #N268978, N268988, N2689889, N2689890, and N2689891;

i. 1 oz. US American Eagle fine gold coins – 14 total;

j. 1 oz. California Gold coin;

k. 1 oz. US gold coin – dated 2009;

l. $20 US gold colored coin – dated 1926;

m. 1 oz. Canadian fine gold coins – 11 total;

n. 1 oz. Australian Kangaroo gold coin – dated 2015;

o. ½ oz. Australian gold coin – dated 1996;

p. 1 oz. Krugerrand South African fine gold coins – 8 total;

q. 1 oz. Republic Osterreich gold coins – 9 total;

r. 1 oz. Year of the Dog fine gold bar – dated 2018;

s. 10 Tolas Swiss Bank Corp gold bar – "999.9" stamped at the bottom.

t. 1 oz. Elemetal fine gold bars – 2 total;

u. 1 oz. OPM Metals fine gold bar – 3 total;

v. 1 oz. Royal Canadian Mint fine gold bars – 2 total;

w. 1 oz. Suisse fine gold bars packaged by PAMP in Switzerland – 50 total;

x. Approximately $226,326 in U.S. currency;

y. AR 15 variant .223 caliber rifle manufactured from an unfinished lower receiver bearing no manufacture markings or serial numbers with a large optic scope;

z. AR 15 variant .223 caliber pistol manufactured from an unfinished lower receiver bearing no manufacture markings or serial numbers;

aa. AR 15 variant .223 caliber pistol manufactured from an unfinished

10

lower receiver bearing no manufacture markings or serial numbers;

bb. Mossberg, Model 500 12 gauge pump action shotgun bearing serial number U448918;

cc. Hatson Arms Co., Model Escort semi-automatic shotgun bearing serial number 336551;

dd. Single round of Winchester 12 gauge ammunition;

ee. Approximately four hundred and twenty rounds of Wolf 7.62 x 39 ammunition;

ff. Approximately fourteen rounds of 14 gauge ammunition; and

gg. Approximately six hundred and sixty rounds of assorted ammunition (520 - 7.62x39; 15 - 12 gauge; 25 - 9mm, 100 - .40).

27. Upon the conviction of the offense alleged in Count 4 of this Information, defendant RICHARD M. OWEN shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d)(1), and Title 28, United States Code, Section 2461(c), all firearms and ammunition involved in the commission of the offense, including but not limited to the following:

a. AR 15 variant .223 caliber rifle manufactured from an unfinished lower receiver bearing no manufacture markings or serial numbers with a large optic scope;

b. AR 15 variant .223 caliber pistol manufactured from an unfinished lower receiver bearing no manufacture markings or serial numbers;

c. AR 15 variant .223 caliber pistol manufactured from an unfinished lower receiver bearing no manufacture markings or serial numbers;

d. Mossberg, Model 500 12 gauge pump action shotgun bearing serial number U448918;

e. Hatson Arms Co., Model Escort semi-automatic shotgun bearing serial number 336551;

f. Single round of Winchester 12 gauge ammunition;

g. Approximately four hundred and twenty rounds of Wolf 7.62 x 39 ammunition;

h. Approximately fourteen rounds of 14 gauge ammunition; and

i. Approximately six hundred and sixty rounds of assorted ammunition

(520 - 7.62x39; 15 - 12 gauge; 25 - 9mm, 100 - .40).

28.  In the event that any of the property described above, as a result of any act or omission of any defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeit substitute property up to the value of the afore-described properties pursuant to Title 18, United States Code, Sections 982(a)(1) and 924(d)(1), and Title 28, United States Code, Section 2461(c).

DATED: August 2, 2019

ROBERT S. BREWER, JR.
United States Attorney
Southern District of California

*/s/ Daniel C. Silva*

DANIEL C. SILVA
Assistant U.S. Attorney